HASKINS TRADING COMPANY, Appellant, v. COOK

(March 15, 1926, Opinion and Decree)

(Syllabus by the Court.)

1. Louisiana Digest—Obligations—Par. 16, 17.

Where both parties contemplate that a proposed sale shall be reduced to writing there is no contract until and unless it is reduced to writing and signed. Until such writing is drawn and signed the contract is inchoate and incomplete and either party may "recant, retract, recede, withdraw, decline to go further" and "refuse to consummate".
(Civil Code, Arts. 1766, 1809. Editor's note.)

Appeal from the Civil District Court, Division "E". Hon. William H. Byrnes, Judge.

Action by Haskins Trading Co. against Herbert N. Cook for damages ex contractu.

There was judgment for defendant and plaintiff appealed.

Judgment afirmed.

Feitel & Feitel and N. H. Polmer, of New Orleans, attorneys for plaintiff, appellant.

Eugene Thorpe, of New Orleans, attorney for defendant, appellee.

WESTERFIELD, J. This is a suit for $600.00 as damages ex contractu. Plaintiff claims to have bought from defendant one carload of Mexican "Garbanzos" (beans) which it is alleged defendant failed to deliver, causing plaintiff to suffer the damages sued for.

There was judgment below in defendant's favor dismissing plaintiff's suit and plaintiff has appealed.

It is alleged that, on April 20, 1922, plaintiff purchased from defendant by verbal sale, through an alleged authorized agent of defendant, one Cambon, one car of Mexican garbanzos, new crop, average 48-54, at $17.00 per 100 kilos, net f.o.b. car New Orleans, in bond, for immediate shipment from Nogales, Mexico; that on

April 24, 1922, petitioner was informed through a Mr. Scott, representative of defendant, that it would be impossible for the defendant to deliver the car of garbanzos sold to petitioner as above set forth; that plaintiff demanded that defendant fulfill his contract and make delivery, and wrote to the defendant on April 24, 1922, calling upon defendant to make delivery within the next five days; that on April 26, 1922, defendant wrote a letter to plaintiff advising that it would be impossible for defendant to make delivery; that following the purchase of the goods, plaintiff had sold same at a profit of 68c per 100 pounds, or a profit of $1.50 on each 100 kilos; that the average car contains 400 bags of 100 kilos; that, at the profit of $1.50 per 100 kilos, plaintiff sustained a loss in profit of $600.00, for which amount he prayed judgment.

Defendant denies that Cambon was his agent and insists that he was the agent of plaintiff, and avers that Cambon in behalf of plaintiff offered to buy from defendant a carload of garbanzos for immediate shipment from Nogales, and that defendant, through his employee, Scott, agreed to sell the car subject to all contingencies which existed in Mexico regarding garbanzos (meaning government embargoes, which it appears were ordered at intervals by presidential manifesto), and upon the understanding that the contract be reduced to writing and signed by both parties; that "because of regulations in Mexico governing the shipment of garbanzos it is uncertain whether or not a shipment can be procured; that this condition is well known to all that deal in garbanzos and was made known by Scott to the said Cambon that the sale would be made subject to defendant's suppliers in Mexico being able to ship the garbanzos out of Mexico; that on April 22, 1922, defendant's "suppliers" in Mexico informed him that they could not ship owing to an embargo then in effect and that defendant thereupon notified plaintiff of that fact.

The first question for our consideration is whether there was any contract between the parties in view of the contention of defendant that it was always contemplated that there should be a written contract protecting him against the contingencies which arose. In other words, defendant's position is that there was only a preliminary discussion and a conditional agreement to sell the garbanzos, the intention being to express the conditions in a written contract, and that when, upon telegraphic inquiry, it developed that the garbanzos could not be shipped, he dropped the matter after notifying plaintiff. Plaintiff, on the contrary, contends that there was a complete verbal agreement with Cambon, whom he claims was defendant's agent, and that Cambon confirmed the sale over the telephone. As to whether Cambon was or was not defendant's agent or plaintiff's agent, we believe he was neither one nor the other but a broker dealing in garbanzos and negotiating this sale as intermediary. The following testimony of Arthur Belmor, plaintiff's export manager, is of interest in this connection:

"Q. That is very important, to find out whether this owner sent him there with a certain message to you, or whether he simply stated the name of the owner and made the offer. What did he say to you, to make you say that the owner of the car sent a message over to you?

"A. I didn't say that. I didn't say the owner sent a message to us. I inferred he was offering the car to the trade, for account of H. N. Cook, and, as we were interested in that commodity, he came to us with the offer.

"Q. It could be possible that Mr. Cam-

bon knew of a party having it and coming to your office and saying the owner sent him?

"A. He didn't say the owner sent him there.

"Q. The owner didn't send him there?
"A. He didn't say so."

Solomon Goldman, the plaintiff, testified as follows:

"Q. Answer the question. Did he tell you that H. N. Cook had sent him there?
"A. I don't know about sending. Agents come every day in the office and offer the party's goods. I didn't know if Mr. Cook had sent him there, but we have to take the customary way."

Urbane Cosam, a witness for defendant, testified:

"Q. What was said at that conversation?
"A. I recall the remark of Mr. Cambon: 'Can you get the garbanzos?' Mr. Scott said: 'I will try to get it.'

"Q. Was there any buying and selling of those garbanzos?
"A. Mr. Cambon was attempting to buy the garbanzos.

"Q. Did he say he wanted them?
"A. Yes, he did.

"Q. Who did he say wanted them?
"A. The Haskins Trading Company."

H. N. Cook, the defendant, testified as follows:

"Q. Did you employ Mr. Louis Cambon to sell for you any garbanzos on or about that date (April 20, 1922)?
"A. I did not."

It is apparent that Cambon was not the agent of either party except in the sense that a broker represents both the buyer and seller. The alleged telephone confirmation by Cambon, if it occurred as plaintiff claims, cannot bind the defendant. Incidentally Cambon did not testify in the case, a fact which is unexplained in the record and cannot help plaintiff's case. Reubenstein vs. Files, 146 La. 727, 84 South. 33.

To return to a consideration of the question of whether the parties contemplated that the contract should be reduced to writing, from which we digressed momentarily to dispose of a collateral issue relatively unimportant, we find the following testimony to be conclusive in affirmation. Plaintiff's witness, Belmar, to whose evidence we have heretofore alluded, says:

"Q. I show you a document dated 4-20-22, signed Haskins Trading Company, reading as follows:

"1 car Mex. garbanzos, new crop 48-54 in 100 kilo bags, at $17 per 100 kilos, net, f.o.b. car New Orleans, immediate shipment from Nogales, weight guaranteed, fumigation certificate, payment arrival goods, allow inspection, 1-c through bank in New Orleans if requested. Subject acceptance 5 p.m. today.
"4-20-22.
                "HASKINS TRADING COMPANY,
                            "By Goldberg.

"Now, did you send that document to Mr. Cook's office by Mr. Cambon?
"A. Mr. Goldberg sent it, with my knowledge.

"Q. Now, after you sent this firm offer over, did you ever send Mr. Cambon over there again to Mr. Cook's office?
"A. Yes, in this sense, that I requested him to get for us the confirmation, written confirmation, of that sale.

"Q. You wanted him to obtain a written contract?
"A. Yes, sir, inasmuch as the sale was made through him, we would request him ——"

Goldberg, the plaintiff, testified that he signed the terms which he had written on a piece of paper and handed it to Cambon.

"Q. You sent that signed order to Mr. Cook?

"A. It was a sales proposition, not an order.

"Q. You sent this document?

"A. I wrote it myself and signed it.

"Q. What did you do with it?

"A. Gave it to Cambon. He had already accepted the $17.00 basis, and I told him under these terms and conditions that we would do business. So he took that notice as the basis on which this car was bought.

"Q. He took it, or did you give it to him?

"A. I gave it to him and he took it."

Scott, who represented defendant in the transaction, testified:

"Q. Did you ever, for and on behalf of Mr. Cook, sign a written contract in this matter?

"A. No, sir; the contract was made up but never signed.

"Q. I show you a document already offered in evidence and marked Cook-1. Did Mr. Cambon ever hand that to you to sign for Mr. Cook?

"A. Yes. sir. He tried every way possible to get me to sign it, and I wouldn't because the deal was not carried through to the finish; it had not been completed; the confirmation was lacking from the suppliers.

"Q. Was there any other reason you didn't sign it?

"A. Yes, because we had a formal contract covering that sale.

"Q. Did Mr. Haskins or did Mr. Cambon come to your office several times, stating that Mr. Haskins had sent him for a written contract?

"A. Yes, sir, he asked for it verbally and over the phone several times on behalf of the Haskins Trading Company."

The conclusion is irresistible that both parties contemplated at all times that there should be no contract other than the one which was to be in writing. Plaintiff had written his terms and given them to Cambon and defendant, refusing to assent to plaintiff's terms, offered a formal contract which plaintiff would not or at least did not sign. There was, therefore, no contract, and the case falls squarely within and is controlled by Laroussini vs. Wer-

lein, 52 La. Ann. 424, 27 South. 89. It was there held that:

"If, when a verbal contract of lease is agreed on, it is understood, contemplated and intended that it should be reduced to writing, that there should be a written lease, that the written lease should take the place of and stand for what has been agreed on verbally in respect to the leasing of the property, then until the writing is drawn up and signed the contract is inchoate, incomplete, and either party, before signing, may recant, retract, recede, withdraw, decline to go further, refuse to consummate."

The instant case is much stronger for defendant than that of Werlein in the Laroussini case. Here it is at least doubtful whether anything definite had been agreed on verbally while in the cited case "a verbal contract of lease is agreed on".

"Common Intent: That is, the common intent of the parties that is to be sought for; if there is a difference in this intent there is no common consent and consequently no contract." R. C. C. 1945, Sec. 4.

"There was no valid binding agreement, amounting to a complete contract, made verbally between the parties in March, 1918, which is enforceable in all of its parts; and as a contract must be treated as a whole, and some of the parts of the alleged contract were not definitely agreed upon, the contract is not enforceable and plaintiffs must fail in their suit. Laroussini vs. Werlein, 12 La. Ann. 424; In re Woodville, 115 La. 810, 40 South. 174; Laroussini vs. Werlein, 52 La. Ann. 426, 27 South. 89; Sig. Haas & Son vs. Bernhardt, 144 La. 930, 81 South. 402.

"Contracts arise from the agreements of parties, not from their disagreements; and, the evidence showing that, for want of clear explanation, the parties misunderstood each other and really disagreed, instead of agreeing, the obligation of the alleged contract cannot be enforced. Pittsburgh, etc., & Oil Co. vs. Slack, 42 La. Ann. 107, 7 South. 230."

For the reasons assigned the judgment appealed from is affirmed.